THE BRUSH-MOORE NEWSPAPERS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73673.   Promulgated November 1, 1935.

*William H. Vodrey, Esq.*, and *William H. Vodrey, Jr., Esq.*, for the petitioner.

*Dean P. Kimball, Esq.*, for the respondent.

364

**OPINION.**

SEAWELL: We will consider the two questions presented in their order.

■ *Payments to Warren G. Harding estate.*—Petitioner contends that these payments are deductible as ordinary and necessary expense of the Harding Publishing Co., its wholly owned subsidiary, under section 23 (a), Revenue Act of 1928. It is not claimed that they are deductible as salary paid to President Harding for per-

sonal services actually rendered by him. *Fifteenth & Chestnut Realty Co.*, 29 B. T. A. 1030. The claim is that the contract under which the expenditures were made was entered into by way of compromise to buy the peace of the Harding Publishing Co. and to save it from threatened litigation which might have caused damage to or loss of good will and the circulation of its newspaper.

The respondent contends that the payments were not ordinary and necessary business expense, that they were rather to be characterized as capital expenditures for the acquisition of the Harding Publishing Co. stock, or gratuities to enable Brush and Moore to obtain the stock; and, in any event, they are not deductible from gross income of petitioner in computing its income taxes.

The fact that the payments were made by way of compromise of a supposed doubtful liability under the old contract is, we think, immaterial. It was said in *Colony Coal & Coke Corporation* v. *Commissioner*, 52 Fed. (2d) 923, that " The fact that a payment is made voluntarily or involuntarily, in the course of legal proceedings or as a result of a compromise settlement, does not change the nature of the transaction. The real test is the character of the transaction that occasions the payment."

The history of negotiations leading up to the old contract executed June 18, 1923, shows that the purchasers (Brush and Moore) offered to pay the vendor (President Harding) $500 per share for his 605 shares of stock of the Harding Publishing Co., but, as the minority stockholders had been offered $600 a share for their stock, President Harding required payment at the same rate for his. The agreement to pay $600 a share for the 605 shares was arrived at when Brush and Moore and President Harding conceived the plan for President Harding to become a contributing editor of the Marion Star when he should retire from the White House to his Ohio farm. This provision was in substance incorporated as article fifth of the contract. Subsection (c) in that article provides, in effect, that death of President Harding should not decrease the amount to be paid by the purchasers. President Harding died before any services as contributing editor were or could have been performed. Subsection (c) goes far to establish the contention of respondent that what the purchasers bought was not the contract for services as contributing editor to the Marion Star, but the 605 shares of stock of the Harding Publishing Co. owned by President Harding. The fact that a separate contract for services had not been written as was provided for does not alter the situation, as all the terms of such contract were embodied in the main contract of June 18, 1923. President Harding's writings would doubtless have been very valuable to the purchasers of the newspaper property if he had lived. He himself expressed the desire to have the facility of the paper

for his own use in making public his views on matters of interest after he left the White House, but this matter was a mere incident in the transaction. The real transaction was the sale of the stock, the consideration for which included the payments under the so-called employment contract. The contract price for the full 800 shares of the stock was $480,000. The old contract, providing for the sale and purchase of the stock and the performance of service as contributing editor, was an indivisible contract. The further fact remains that if the ten yearly payments of $13,300 were not to be included in the price of the stock the average price for the Harding stock would have amounted to less than $435 per share, or $65 less per share than the purchasers at first offered to pay and $165 less per share than Brush testified they were to pay for the stock under the contract.

After the death of President Harding, and on December 8, 1923, Brush and Moore each signed a contract guaranteeing the payments of $13,300 per year for ten years in accordance with the provisions of article fifth of the contract of June 18, 1923 (the old contract), in which contract it is recited with reference to the said payments, " the same being part of the original purchase price of the - said six hundred and five (605) shares of stock in the Harding Publishing Company purchased under said agreement " (of June 18, 1923, the old contract). If this statement is true the expenditures were for a capital asset and not deductible. *Warren Steam Pump Co.*, 13 B. T. A. 721. But petitioner in its brief now says that these payments were not made " as part of the purchase price for the shares in The Harding Publishing Company owned by President Harding." It is admitted in the brief though that that statement and the statement in the contract of December 8, 1923, are inconsistent. The fact that the words quoted from the contract were placed therein by the attorney for the Harding family, as contended, could not render them nugatory. Even though they do not now represent the views of Brush and Moore, as they testified, they can not be removed to accommodate their present views. No evidence was offered to show any undue influence, coercion, fraud, or incapacity of the makers of the contract or any wrongdoing in the inclusion of said words in the contract or any reason sufficient to remove or rescind them. They harmonize and accord with the whole evidence of the case. *Greene & Greene*, 11 B. T. A. 643.

The facts of this case differentiate it from the line of cases cited in petitioner's brief, all of which we have reviewed with care. Upon the conclusion we have reached, that the payments sought to be deducted were made as part purchase of the corporate stock owned by President Harding, it follows that they are not deductible

as ordinary and necessary expenses of the business of petitioner. The evidence offered fails to convince us that in any other way the payments are deductible. *Burnet* v. *Houston*, 283 U. S. 223. We sustain the Commissioner on this point.

■ *Contributions to charitable organizations.*—Petitioner claims that it and its subsidiaries made contributions to various charitable and related agencies and that its payments therefore are deductible, under section 23 (a) of the Revenue Act of 1928, as ordinary and necessary expenses. It relies on the case of *Evening Star Newspaper Co.*, 28 B. T. A. 762.

The decision in the *Evening Star* case, however, was reversed on June 10, 1935 (after petitioner's brief was filed), by the United States Circuit Court of Appeals for the Fourth Circuit, 78 Fed. (2d) 604, and the court said:

The taxpayer contends the contributions were a "consideration for a benefit flowing directly to the donor as an incident of its business." The manager and the associate editor in substance stated that they do not know whether the Star sold any more papers because of its support of the Community Chest; nor do they have definite information as to how much advertising resulted from the contribution; but, while they have no way of showing, they think definitely the result was a larger sale of papers; the prestige of the paper was enhanced and, having urged others to give until it hurt, its prestige would have suffered if it had not contributed in a liberal manner.

Whether the contributions resulted in an increase in the circulation or advertising of the Star, and, if any, to what extent, is of necessity, mere conjecture. The evidence falls far short of establishing either proposition. If any benefit, in either respect, did accrue, it is so indirect and remote that it can not rise to the dignity of being substantial, nor warrant a finding that the donations involved were, in a genuine sense, necessary and ordinary expenses within the meaning of section 23 of the Revenue Act of 1928, or of the Treasury Regulations 74. It is not enough that the expense be necessary; it must be ordinary and necessary. *Welch* v. *Helvering* [*supra*].

The facts in the case at bar are quite similar to those in the *Evening Star* case. Roy D. Moore, vice president and general manager of the petitioner, could not distinguish between contributions made "for charity's sake" and those made for the benefit of circulation and advertisement. The petitioner has failed to show any specific benefit, actual or potential, arising from its contributions. We are unable to find that the donations made by the petitioner were made for business reasons and were calculated to produce a commensurate return. We sustain the Commissioner on this issue.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Van Fossan, dissenting: I am obliged to dissent from the ruling of the majority. The facts of the case show clearly that the payment were not made under the provisions of the original contract,

but arose solely from the subsequent agreement. The record also proves beyond any doubt that the motivating cause which resulted in this contract—the cause, except for which the contract of December 8, 1923, would never have come into existence—was the threat of a lawsuit with possibly damaging consequences to the business of petitioner.

The fallacy in the reasoning of the majority opinion is the assumption, for which I can find no foundation in fact, that the payments made under the second contract were in part payment for the stock. Petitioner's subsidiary received nothing in the way of a capital asset as a result of the payments. It already had the stock. President Harding was dead and his services as an associate editor were not available. The only thing received, and it was the thing purchased, was the assurance that petitioner's subsidiary would not be injured in its business by a lawsuit.

Had President Harding lived and the supplemental contract originally contemplated been executed, can it be doubted these annual payments would have constituted income to him, or, to state it conversely, in that event, could it successfully have been contended that such payments were in part payment for the stock? A reading of the contract entirely negatives such a suggestion. The original contract contemplated two things—the purchase of the stock and the acquisition of the services of President Harding as an associate editor, the latter to be the subject of a supplemental agreement. President Harding died and the supplemental contract for services became impossible of execution. Thus, the original contract became a contract for the purchase of the stock only. The majority opinion says this contract was indivisible. It was nevertheless complete, although by subsequent events it became impossible of fulfillment in part. It seems to me to be pure fiction to say that the payments in question were part of the original purchase price of the stock.

The record, when read in its entirety, effectively refutes and explains the implications of the clause added at the insistence of the attorney for the estate. The reason for such insistence on his part is obvious. By characterizing the payments as part of the purchase price of the stock, his client might avoid the income tax that would otherwise attach to the receipt of the payments.

Tax liability should be determined by considering the entire record, not on the basis of the single fact just alluded to and thus readily explained.

On the facts before us it is clear that the circumstance which compelled the petitioner's subsidiary and officers to agree to the terms imposed by the settlement of December 8 was the threat of an attack on its standing and reputation in the community of Marion. The

majority opinion rightly suggests that the successful operation of a newspaper is singularly dependent upon the good will and favor of its readers and of the community. Particularly is this true when it is owned by nonresidents. We may well conclude that a suit brought by the widow of a President in his own home town, and the controversial issues raised thereby and exposed to public view for discussion and possible condemnation, might have injured severely the petitioner's reputation and might have had a disastrous effect on its business. Petitioner was fully justified in considering the execution of the settlement agreement compulsory and the payments made thereunder to be necessary.

In *Welch* v. *Helvering*, 290 U. S. 111, Justice Cardozo said:

\* \* \* Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser* v. *United States*, 276 U. S. 145, 72 L. ed. 505, 48 S. Ct. 219. \* \* \*

In *Helvering* v. *Community Bond & Mortgage Corporation*, 74 Fed. (2d) 272, affirming 27 B. T. A. 480, the situation was quite similar to that in the case at bar. There, an expenditure was made to cancel an agreement with an agent whose activities were causing damage to the taxpayer's reputation. In allowing the deduction the court said:

\* \* \* It is not an unusual occurrence of business for a business enterprise, burdened with an unprofitable contract, to secure its cancellation by payment of money, and it is difficult to see why an expense thus incurred is not an " ordinary and necessary expense according to the ways of conduct and forms of speech prevailing in the business world." *Welch* v. *Helvering* [*supra*].

\* \* \* The money paid in the instant case was to save the reputation of the respondent, to make possible its future earnings. \* \* \* In the instant case, the taxpayer's reputation was being injured by the conduct of its agent, and its primary motive in seeking the cancellation of the contract was to prevent the loss of earnings. Its contract with the agency proved to be unprofitable. This we think was an expenditure ordinary and necessary in carrying on the business, and deductible from the respondent's gross income.

I am of the opinion that the money expended to prevent an event which would impair, or might even destroy, the petitioner's most valuable asset, its reputation and standing in the community, is deductible as an ordinary and necessary expense. The Board has so held in numerous cases. See *North American Investment Co.*, 24 B. T. A. 419; *W. R. Hervey*, 25 B. T. A. 1282, and cases therein cited, See also *Louisiana Jockey Club, Inc.*, 13 B. T. A. 752.

TRAMMELL agrees with this dissent.