Enrico Faraoni v. Commissioner. Enrico Faraoni and Rose Faraoni, Husband and Wife v. Commissioner.
Faraoni v. Commissioner
Docket Nos. 34286, 34287.
United States Tax Court
1954 Tax Ct. Memo LEXIS 319; 13 T.C.M. (CCH) 103; T.C.M. (RIA) 54035; January 29, 1954
Leslie W. Fleming, Esq., for the petitioners. Roy E. Graham, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner determined the following deficiencies in the petitioners' income tax, victory tax and additions to tax under section 293 (b), Internal Revenue Code: Docket No. 34286
Income and
Additions
Year
Income Tax
Victory Tax
to Tax
1942
$3,212.39
$ 1,606.20
1943
$5,936.64
2,857.19
1944
25,010.29
12,505.15
1946
552.72
276.36
1947
241.86
Docket No. 34287
1948
644.18
The issues for decision are as follows: (1) Did Enrico Faraoni understate his net income on his Federal income tax returns for the taxable years ended December 31, 1942, 1943, 1944, 1946 and 1947? *320 (2) Did Enrico Faraoni and Rose Faraoni understate their net income on their Federal income tax return for the taxable year ended December 31, 1948? (3) Were any of the alleged deficiencies in tax of Enrico Faraoni due to fraud with intent to evade tax? Findings of Fact Some of the facts are stipulated and are found as stipulated. The petitioners are husband and wife, residing in Detroit, Michigan. Enrico Faraoni, hereinafter referred to as the petitioner or Enrico, filed his income tax return for the calendar year 1942 with the collector of internal revenue at Detroit, Michigan. This return was not signed by the petitioner. Enrico filed his Federal income and victory tax return for the calendar year 1943 and Federal income tax returns for the calendar years 1944, 1946 and 1947 with the collector of internal revenue at Detroit, Michigan. Enrico and Rose filed their joint Federal income tax return for the calendar year 1948 with the collector of internal revenue at Detroit, Michigan. Enrico came to the United States in 1907 when he was about 14 years old. His first job in this country was on the railroad. Later he worked for Studebaker Corporation and the American Car Foundry. *321 In 1923 Enrico and his first wife, Malia, had a confectionary store. Malia took care of the store while Enrico worked at Studebaker. On April 21, 1925, Malia obtained a default decree of divorce from Enrico on the grounds of nonsupport and extreme cruelty. After the divorce was granted, Enrico asked that it be set aside. The petition to vacate or modify the decree was as follows: "Now comes the above named defendant, Enrico Faraoni, by Walter M. Nelson, his attorney and respectfully shows unto this honorable Court: "1. That heretofore on April 21, 1925 a default decree of divorce was granted the plaintiff, as more fully appears from the files and records of this Court in this cause; "2. That the custody of the three children of the parties hereto was given the plaintiff without any provision for visitation by this petitioner or for partial custody thereof; "3. That petitioner is thirty-three years of age and that said children are of a tender age and that there is a strong affection and bond of attachment between petitioner and said children; "4. That while said cause was pending, the only property owned by the parties hereto, a vacant lot, was sold and the proceeds thereof *322 paid to the Friend of the Court, and that at the time of the entering and signing of said decree about Four Hundred Ninety Eight and Fifty Hundredths ($498.50) Dollars remained in the hands of the Friend of the Court; that the alimony ordered has been paid to date and that petitioner is in need of the only capital which he possesses while the sum rests in the hands of the Friend of the Court performing no useful service; "5. That this petitioner is greatly indebted; that he owes One Hundred Six ($106.00) Dollars to the Morris Plan Bank, on which he is required to pay Four ($4.00) Dollars a week; that he owes Grocery bills, one as much as Sixty-seven ($67.00) Dollars; that he owes Tony Volpe One Hundred Ten ($110.00) Dollars; and that he owes other sums and persons so that the total is more than Three Hundred ($300.00) Dollars; "6. That the average weekly wage of petitioner per year does not exceed Twenty-five ($25.00) Dollars per week; that on occasions he is able to earn, for short periods of time, as much as Thirty-five ($35.00) Dollars per week and on other occasions he is unable to earn more than Fifteen ($15.00) or Eighteen ($18.00) Dollars per week; and at other times is, *323 through no fault on his part, out of employment; "7. That it is impossible for the petitioner to regularly pay alimony in the sum of Fifteen ($15.00) Dollars per week; "8. Petitioner denies that he was guilty of extreme cruelty or non support as charged in the Bill of Complaint, and tenders an answer to the Bill of Complaint of plaintiff, if permitted by this Court to file the same; further petitioner says that he has cause for divorce which he desires to set up in a Cross Bill, if permitted by this Court to file the same. "Inasmuch as petitioner is without remedy except in this Court of equity he prays: "I. That the final decree of divorce filed and entered in this cause be vacated and set aside; "II. That this petitioner be permitted to file in this Court and cause his answer and Cross Bill; "III. That said final decree of divorce be modified and made to provide for visitation of said children by this petitioner and for their custody by him at stated and approved intervals; "IV. That said final decree be modified and the alimony provided therefor be reduced to a sum which this petitioner can pay and in accordance with his economic position and ability; "V. That the *324 funds in the hands of the Friend of the Court be ordered forthwith paid to this petitioner; "And this petitioner will ever pray. "/s/ ENRICO FARAONI" The divorce was not set aside. In 1929 Enrico operated a small neighborhood grocery store. During 1930 and 1931 Enrico had a one-third partnership interest in a poolroom. In 1935 petitioner went into the saloon business at 3441 Rivard Street. Subsequently petitioner purchased a building at 3062 Rivard Street and remodeled it into a bar and moved to this new location. Enrico operated a bar at this location from 1937 to 1950 when his license was revoked for violation of the rules and regulations of the Michigan Liquor Control Commission. Petitioner married Rose in 1944 after living with her since 1932. The building at 3062 Rivard Street in which the tavern was located was a two-story corner building. The tavern was on the first floor and petitioner's living quarters were on the second floor, where he lived from 1938 to 1944. The tavern consisted of a bar, one divided large room and a cabaret, accommodating about 180 people; a partition separated the bar and the cabaret. In the cabaret there was a bandstand, dance floor and tables *325 in a double aisle placed like a "U". There were tables in the large room and bar stools at the bar. There were two cash registers, one situated in the middle of the bar and one at the end of the bar used primarily for cabaret business. The tavern was located in one of the roughest sections of the city of Detroit. The cabaret was open on Friday, Saturday and Sunday nights from 9 p.m. until 2 a.m. Colored floor shows were presented in the cabaret and a band provided dance music. During the war when business was good, the admission to the cabaret was $1.20. In 1942 the tavern employed two waitresses, two bartenders and a manager. When business picked up in 1943, there were from ten to fifteen employees. Petitioner also employed a special policeman. The tavern was open for business as early as 7 a.m. and remained open until 2 a.m. The petitioner had no books for the year 1942. For the year 1943, petitioner maintained a large ledger. This ledger had several columns so as to provide for showing all of the disbursements made for purchases and other operating expenses. There were no daily entries for either income or expenditures for the entire period from January through June, inclusive, *326 although the books did reflect a monthly total for each item. Admission charges to the cabaret were noted on cash register tapes and included with bar sales. The total 1943 gross receipts as shown by petitioner's books were $41,404.97. Petitioner's income tax return for 1943 showed $53,184.02 as gross receipts, an increase of $11,779.05. Petitioner offered no explanation to the examining agent for this discrepancy. The books for the early part of 1943 were kept by one Emory Volpe, who was also employed by petitioner as assistant manager. Purchase slips were placed in a box and cash register tapes were dated and put in a box. Volpe then entered in the books whatever the purchase slips and cash register tapes showed. Sometimes daily entries were made and on some occasions slips were accumulated and a weekly or monthly sales figure entered. A new set of books were set up for the business in mid-1943 by Joseph Basso. Basso explained how to make the entries and how to make a profit and loss statement each month. He had nothing further to do with the books until mid-1946, but he did prepare the income tax returns for 1943 and later years. Basso was a deputy collector for the Bureau of Internal *327 Revenue until he resigned in January 1947. For the year 1944, daily income and expense items were shown in the books. The 1944 gross receipts per the books amounted to $55,181.97. Petitioner's income tax return for 1944 showed $62,981.97 as gross receipts, an increase of $7,200. No explanation was offered by petitioner as to why the books did not correspond with the income tax returns. Music box income was not recorded in the books, but the income tax return showed $378.90 as music box income. There were no irregularities or discrepancies between petitioner's books and tax return filed for 1945. For the year 1946, the petitioner's books contained no daily entries for income for the month of February and only a few daily postings for purchases in February. There were no daily entries for income for the months of March and October. Personal expenses, such as laundry, lumber for petitioner's home, a pair of binoculars, a trunk, a vacuum cleaner, and feed for chickens, were posted in the books as business expense. The gross receipts shown on the books for 1946 were $57,422.12. The petitioner's income tax return for 1946 showed gross receipts of $53,422.12, or a decrease of $4,000. *328 The petitioner offered no explanation concerning this discrepancy. For the year 1947, the gross receipts as shown by the books agreed with the petitioner's income tax return except that "other income" shown by the books amounted to $874.34 while on the income tax return for that year it was shown as $1,150. There were no daily entries for the month of May. For the year 1948, the gross receipts as shown by the books agreed with petitioner's income tax return. There were no daily entries for income for the months of February, March, April, July, August and September 1948. Sometimes weekly entries were made for those months and sometimes monthly entries were made. The books and records kept by petitioner for the years 1942, 1943 and 1944 did not completely, clearly and truly reflect his income for such periods. The following statement shows the petitioner's net worth and cash expenditures from December 31, 1941, to December 31, 1944, inclusive: NET WORTH AND CASH EXPENDITURES
Balance at
Balance at
Balance at
Balance at
ASSETS
12-31-41
12-31-42
12-31-43
12-31-44
Cash on hand
$ 4,000.00
$ 4,000.00
$ 4,000.00
$ 4,000.00
Cash in Bank-Detroit Bank Br. #11
758.46
2,158.17
10,060.39
12,960.97
U.S. Savings Bonds at Cost
3,525.00
23,755.00
Land Contract Rec.-Graqiani Calogero &
Maria Cordaro
5,000.00
2,964.93
Building at 3062 Rivard, Detroit, Mich.
8,000.00
8,000.00
8,000.00
8,000.00
Improvements to above property
2,000.00
2,000.00
2,000.00
2,000.00
Furn., Fxtrs. & Equip., 3062 Rivard
8,660.00
13,147.00
15,450.00
21,450.00
Merchandise Inventory
3,183.53
8,157.42
13,937.83
16,937.83
Residence, 22865 Hillock, E. Detroit
7,000.00
Furniture, 22865 Hillock
2,000.00
Furniture, 3062 Rivard
2,000.00
2,000.00
2,000.00
Dodge truck
975.00
975.00
975.00
975.00
Vacant Real Estate-Lot 414 & 415,
George Epstein Sub.
1,400.00
1,400.00
1,400.00
1,400.00
TOTAL ASSETS
$30,976.99
$41,837.59
$61,348.22
$108,443.73
LIABILITIES
Land Contract Payable - First Liquidat-
ing Corp.
$ 4,320.87
RESERVE FOR DEPRECIATION
Building & Improvements
$ 694.16
$ 864.16
$ 1,034.16
$ 1,204.16
Furniture & Fixtures
2,015.16
3,763.06
5,761.26
8,324.46
TOTAL RESERVE FOR DEPRE-
CIATION
2,709.32
4,627.22
6,795.42
9,528.62
NET WORTH
23,946.80
37,210.37
54,552.80
98,915.11
NET WORTH INCREASE
13,263.57
17,342.43
44,362.31
Add: Estimated income tax payments
1,610.28
Final income tax payments
114.66
563.02
958.50
Estimated cost of living
1,500.00
1,500.00
2,500.00
Total Available Income
14,878.23
19,405.45
49,431.09
Less Business Income Reported Per Re-
turns
4,592.71
6,974.50
8,160.68
UNREPORTED BUSINESS INCOME
$10,285.52
$12,430.95
$41,270.41
*329 Some of the amounts used on the net worth statement indicating cost of furniture, fixtures and equipment at 3062 Rivard for the years 1941 through 1944 were arrived at by analysis and summary of the Inventory of Capital Investments sheets found in petitioner's books. From 1924 to 1942 petitioner obtained loans from various banks as shown by their loan record cards as follows: INDUSTRIAL NATIONAL BANK
Application
Date
No.
Loan No.
Maker [1]
Co-Maker [1]
Co-Maker for
11-18-24
43694
133625
$200.00
11-25-29
308292
Declined
300.00
4-21-30
Applied
M.I.B.
6-24-32
Co-Maker
C.C.S.B.
7-30-34
Applied
C.C.S.B.
10-19-36
Applied
D.B.
8- 3-37
645652
Declined
$150.00
Joseph Valente
8-12-39
Applied
F.H.A.
D.B.
2- 8-40
Applied
Auto
D.B.
4-16-41
18628
562505
540.00
Ray F. Fracassi
7-11-41
Applied
F.H.A.
D.B.
10-14-41
51070
570026
863.00
Ray F. Fracassi
THE DETROIT BANK
10-20-36
P 4241
4-570MM
$ 200.00
1-24-38
P 10556
27-1938M
500.00
8-12-39
F 31022
2- 8-40
P 39752
25-7285A
424.00
3-24-41
A 66166
29-16313A
424.00
7-11-41
F 74973
Withdrawn
425.53
4-27-42
92491
14-469F
1,001.54
*330 Petitioner sometimes signed as co-maker rather than principal. The petitioner filed his first Federal income tax return for the year 1936. A tax of $29.40 was paid on this return. Petitioner filed a return for 1937 which did not disclose a tax liability. No income tax return was filed for 1938. For the year 1939 petitioner filed a return and paid a tax of $8.06. For the year 1940 petitioner filed a return and paid a tax of $41.92. Petitioner's 1941 return indicates he paid a tax for that year of $114.66. An amended Federal income tax return was filed for 1941 and additional income tax of $236.74 was paid. Based on those returns petitioner's total income for the period January 1, 1936, through December 31, 1941, would be approximately $20,000. Petitioner made the following expenditures during the period January 1, 1936, through December 31, 1941: Reduced land contract payable to First Liquidating Corporation, $1,803.62; discharged $1,500 note to Central Discount Corporation; invested in furniture and fixtures, $6,835, less $1,500 to Central Discount *331 Corporation, $5,335; paid on income taxes, $202.36; increased commercial account at Detroit Bank, $758.46; cost of living six years, at $1,000 per year, $6,000; and paid on loans to Detroit Bank, $1,064.87. Petitioner's cousin, Angelo Carboni, began working for him in 1936 and was paid a weekly wage, plus room and board. Enrico retained 90 per cent or more of Angelo's wages and kept the money in his safe. Angelo also drew his money out of the bank and gave it to Enrico to use in cashing checks. On August 29, 1948, petitioner gave a promissory note to Angelo for $7,000. When petitioner's business was closed in 1950, petitioner owed Angelo $12,000 and executed a mortgage to him in that amount. Petitioner and his wife Rose lived a frugal life, both before and after marriage. Petitioner itemized personal deductions on his 1942 and 1943 returns as follows: PERSONAL DEDUCTIONS
1942
City and county tax
$404.96
Auto license and stamp
18.29
Truck license
24.50
$447.45
1943
Contributions - church and charity
$150.00
Auto license
11.25
Auto stamp
5.00
Sales tax
60.00
Amusement tax
25.00
Gasoline tax
30.00
$281.25 Petitioner's living expenses *332 for 1942 and 1943 were $1,500 per year and for 1944, $2,500. Petitioner purchased and has resided in a single residence since 1944. Since his purchase of the residence, he has paid about $170 a year in real estate taxes thereon. In 1946, petitioner purchased two new cars, a Buick at $2,023.75 and a Cadillac at $2,588. Petitioner took a trip to Italy in 1947 at a cost to him of $3,100. He took his Cadillac with him. Petitioner did not report interest income for the years 1946 or 1947 on his Federal income tax returns for those years. Interest income for 1946 was $448.43 and for 1947, $562.43. Petitioners did not report interest income for the year 1948 on their joint income tax return. Interest income for 1948 was $859.54. Respondent's deficiency notice increased petitioner's reported income based on a net worth statement as follows: Reported
Additional
Income as
Year
Income
Income
Adjusted
1942
$4,144.96
$10,039.34
$14,184.30
1943
6,693.25
12,930.95
19,624.20
1944
7,660.68
41,270.41
48,931.00
Petitioner understated his income for 1942, 1943 and 1944 as shown in the aforementioned net worth statement. The Commissioner determined petitioner *333 understated his business income for 1946 in the amount of $2,172.32 and for 1947 in the amount of $556.10. Respondent also determined petitioners understated their business income for 1948 in the amount of $3,102.99. Petitioner understated his business income for 1946 in the amount of $2,172.32. Petitioner did not understate his business income for 1947 and 1948. The deficiencies for the years 1942, 1943, 1944 and 1946 were due to fraud with intent to evade tax. Opinion Respondent determined deficiencies in petitioner's income and victory tax, together with additions to tax under section 293 (b) of the Internal Revenue Code, for the years 1942, 1943, 1944 and 1946. Respondent determined a deficiency in the petitioner's income tax for 1947 and also determined a deficiency in the income tax of petitioner and his wife for 1948. The deficiencies for the years 1942, 1943 and 1944 are based on petitioner's increase in net worth for those years. Petitioner's first contention is that his books are complete, therefore respondent may not resort to the net worth method. The petitioner's books have been shown to be incomplete and inaccurate as set forth in our *334 findings of fact. In one year the books show more income than was reported and in two years the books show less income than was reported. It is well established that if records are incomplete or inaccurate, the Commissioner may use such other method as will produce the correct tax liability. Louis Halle, 7 T.C. 245; Arlette Coat Co., 14 T.C. 751. Respondent was justified in using a net worth computation of income. Petitioner next contends that certain items on the net worth statement are incorrect, making the entire net worth statement inaccurate and unrealistic. The items which petitioner contends are incorrect are: opening cash on hand, improvements to property at 3062 Rivard, furniture and fixtures at 3062 Rivard, reserve for depreciation on building, improvements and furniture and fixtures and estimated cost of living. The petitioner concedes that the remainder of the items on the net worth statement are correct. Petitioner claims that he had $25,000 in cash on hand on December 31, 1941. In support of this contention he alleges that two of his employees saw this money in his possession, that he always carried large sums of money, that his wife turned *335 over to him money she had earned, that he had a large amount of cash because he distrusted banks, and that he spent very little money for living expenses. One of the petitioner's employees, Michael Fenell, stated petitioner had about $25,000 in November 1940. He testified that he counted the money with petitioner and the manager of the bar. Fenell also testified that the largest amount of business he remembered having been done by petitioner in a business day was $400 on a New Year's night. The other employee, Emory Volpe, could not state definitely when the $25,000 was counted but believed that it was counted in the last quarter of 1941. Volpe also knew petitioner held all of Angelo's cash or checks but could not state how much of the money which he saw counted belonged to Angelo. We are not convinced of the trustworthiness of this testimony. It is unlikely petitioner would have $25,000 in his safe when the most business done by him in one day was but $400. Volpe and petitioner admitted some of the money allegedly counted was Angelo's but neither could say how much was petitioner's and how much was Angelo's. Neither could petitioner remember how much money he had on any other date, *336 but he was positive he had $24,000 or $25,000 cash on hand in 1941. That it was necessary for Angelo to leave his money with petitioner in order that the checks of customers might be cashed is inconsistent and irreconcilable with petitioner's possession in his place of business of as large a sum as $25,000. Petitioner's claim of so large a sum of cash on hand is in direct contravention to the statement he made to respondent's examining agents on February 9, 1950, that he never at any time had on hand more than $3,000 in cash for current business operations, and that he usually made deposits every two or three days. Petitioner has not given this Court any indication as to how he accumulated the sum of $25,000. Petitioner stated in a divorce suit pleading filed in 1925 that he could not make alimony payments to his wife as he was greatly indebted and could not pay $15 a week to support his three children. He therein alleged his sole property holding had been sold for $498.50. One of petitioner's witnesses, a Detroit policeman who had known him since 1929, testified petitioner did not have any substantial amount of money until 1935. The largest amount of money the policeman ever saw *337 in petitioner's possession was about $4,000. Petitioner had not filed income tax returns prior to 1936. The record shows that based on income tax returns filed from 1936 to 1941, inclusive, petitioner's income was approximately $20,000. He spent on actual expenditures and living costs roughly $16,000 during this period. Based on these facts, the conclusion is inescapable that petitioner could not have accumulated $24,000 or $25,000 by 1941 as claimed by him. Petitioner's claim that he received money from his wife is uncorroborated and there has been no indication of the amount of money the wife earned or turned over to him. The petitioner's wife did not take the stand. Petitioner claimed he distrusted banks due to his experience with them in the depression, yet this fear did not prevent him from making deposits in 1935 and 1936, and he admits having had money in the bank in 1941. He was not unwilling to deal with banks from 1924 to 1942 as during those years he borrowed money from them. He claims his purpose for so doing was to establish credit. If petitioner always had substantial sums of money on hand, as he claims, it would not seem reasonable that he needed bank credit. *338 From a consideration of the entire record, we conclude that petitioner had $4,000 cash on hand on December 31, 1941, and maintained that amount on hand regularly. Petitioner further contends that the amounts in the net worth statement designated as having been expended for improvements and furniture and fixtures at 3062 Rivard are incorrect. The respondent, based on information given to him by the petitioner when the investigation started, determined that petitioner spent $2,000 in repairs to the building at 3062 Rivard when it was purchased in 1938. The petitioner's first attorney, Walter J. Murray, also furnished respondent with a statement showing improvements since the date of purchase. Based on this statement, respondent added $4,550 in 1947 to the improvements account. Petitioner submitted an additional statement pertaining to such improvements at the trial and also testified that the improvements were made in 1941 or prior years. The latter statement submitted is uncorroborated. No evidence, such as invoices, receipts, canceled checks, or bills, was produced by petitioner to substantiate his claim that the respondent's determination as to the amount and date of the improvements *339 was incorrect. We are not disposed to accept this statement and testimony as overcoming the previous representations made by the petitioner. Evan V. Quinn, 26 B.T.A. 970, 976; Brush-Moore Newspapers, Inc., 33 B.T.A. 362, 369. In regard to furniture and fixtures the respondent used an inventory of capital investments taken from one of petitioner's books. This inventory was prepared during 1944 or 1945. It contains a list of fixtures, the date acquired, cost, estimated life and depreciation. At the trial petitioner offered as an exhibit another list of fixtures prepared for the internal revenue agent after the investigation was in progress. Based on this latter inventory, petitioner claims many of the fixtures were purchased between 1938 and 1941. In addition to this list petitioner offered one invoice from the National Cash Register Company showing he had purchased a cash register in 1940. He offered no additional bills, canceled checks, invoices or receipts to substantiate his new list of fixtures. We have adjusted the amount of fixtures on the net worth statement in the light of this one invoice. However, we are not persuaded that the new inventory to any *340 extent supersedes as evidence the previous representation made by the petitioner. Evan V. Quinn, supra. During the trial, testimony was given by the petitioner's bookkeeper, Joseph Basso, that the petitioner's building should be depreciated on a 30-year life instead of a 50-year life. In his brief petitioner does not argue this contention but merely urges that depreciation should be computed on the basis of the dates he claims the improvements and furniture and fixtures were acquired. He does not present an argument regarding the rates of depreciation used by the respondent. We have used the rates of depreciation employed by respondent and have adjusted the amount of depreciation for the cash register which was purchased in 1940. The last item on the net worth statement with which petitioner takes issue is the estimated cost of his living. He contends that he led a frugal life; that he did not have to pay for rent, utilities or food because he lived over the tavern and obtained food and utilities from that establishment; that he worked long hours; that due to his wife's illness no funds were spent for recreation or social activities; and that after he bought a home *341 in 1944 he raised vegetables, fruits and chickens, thus decreasing the cost of food for his family. He states his living expense for 1942 and 1943 should be $400 a year and $600 for 1944, or approximately $6 to $10 a week for two persons. Petitioner presented no analysis or specific evidence to substantiate this contention. On the record before us, we are not convinced that those amounts represented, or approximately represented, the living expenses of petitioner and his wife. The fact that food was taken from the tavern and utility bills were paid from receipts of the tavern in nowise alters the fact that the cost of those items represents living expenses. Furthermore, the petitioner doubtless made outlays for doctor bills and medicines for his wife. From a consideration of the evidence, we have found that petitioner's living expenses were $1,500 in 1942 and 1943 and $2,500 in 1944. The respondent did not use the net worth method for the years 1946, 1947 and 1948 in computing the deficiency. Petitioner contends that the respondent's whole case must fall because respondent did not use the same method in determining the deficiencies for all years. He cites no authority to support *342 this contention and we know of none. Each year is a separate taxable entity, Burnet v. Sanford & Brooks Co., 282 U.S. 359, and under section 41 of the Internal Revenue Code the Commissioner has the authority to compute income in accordance with the method which, in his opinion, clearly reflects the income where the method used by the taxpayer does not clearly do so. We can find no error on the respondent's part in his use of the net worth method in some years and another method in other years. In his return for 1946, the petitioner reported $4,000 less income than was shown on his books. He deducted in his return expenditures made for personal purposes. No explanation was offered as to the understatement of income nor is any contention made that the deductions for personal expenses were allowable. In this situation the petitioner concedes on brief that the deficiency in tax for 1946 may properly be assessed. For the years 1947 and 1948, respondent increased income from business in the amount of $556.10 and $3,102.99 because the books did not reflect the cabaret admission charge. The petitioner, his bookkeeper, manager and bartender all testified *343 that admission charges were included in gross sales and the income tax returns show the Federal entertainment tax was paid. Respondent has not controverted this testimony. We, therefore, conclude there was no understatement of income from the business for the years 1947 and 1948. There is, however, a deficiency in 1947 and 1948 for failure to include interest income. The petitioner's remaining contention is that respondent has not sustained the burden of proving fraud by clear and convincing evidence. In his answer, respondent alleged that petitioner, with the intent of evading Federal income and victory taxes, did willfully and fraudulently understate his net income in 1942, 1943, 1944 and 1946. For the years 1942, 1943 and 1944, the respondent has produced a net worth statement which was prepared after extensive investigation and which, with the abovenoted exceptions, appears to be correct. Petitioner contends he had $25,000 cash on hand and that he owned numerous assets in addition to those the respondent has credited him with owning in 1941. Petitioner's proof has consisted entirely, with one exception, of repudiating statements he made, and documents he furnished, at the beginning *344 of the investigation. He submitted only one invoice to corroborate his statements. He presented no canceled checks or receipts at the trial to show when certain assets were purchased. Petitioner has been in this country for over 40 years and has worked on the railroad, for Studebaker, run some grocery stores, a poolroom with two partners, and two taverns. He employed ten to fifteen persons in 1943. The record shows that his manager kept the books for the first part of 1943. Petitioner has made no showing as to who kept the books from 1943 to 1946 and the only conclusion we can come to is that after his accountant had explained to him how to keep books, petitioner kept them himself. We, therefore, believe that he had enough intelligence and business judgment to know whether he had $4,500 net income or $15,000 net income in 1942, $7,000 or $19,000 in 1943, and $8,000 or $49,000 in 1944. We are unable to conclude that petitioner was unaware of the increases in his financial condition. "Discrepancies of 100% and more between the real net income and the reported income for three successive years strongly evidence an intent to defraud the Government." Rogers v. Commissioner, 111 Fed. (2d) 987, 989; *345 Arlette Coat Co., supra, 756. In his return for 1946, the petitioner reported gross income of $3,706.73 for that year. That amount was $4,000 less than the gross income shown by his books. No explanation was given for this discrepancy. In this situation it is apparent that petitioner failed to report more than one-half of his income. From a consideration of all the evidence bearing on the question, we have found as a fact that the deficiencies for 1942, 1943, 1944 and 1946 were due to fraud with intent to evade tax. Therefore, we hold that respondent did not err in asserting for those years the additions to tax under section 293 (b) of the Internal Revenue Code. Decisions will be entered under Rule 50. Footnotes
1. Key: ↩
M.I.B.
Metropolitan Industrial Bank
C.C.S.B.
Commonwealth Commercial Savings Bank
D.B.
Detroit Bank