**BRUSH–MOORE NEWSPAPERS, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 7462.

Circuit Court of Appeals, Sixth Circuit.

April 8, 1938.

William H. Vodrey, of East Liverpool, Ohio, for petitioner.

Louise Foster, of Washington, D. C. (James W. Morris, Sewall Key, and Norman D. Keller, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Petition by the Brush-Moore Newspapers, Inc., to review a decision of the Board of Tax Appeals affirming the action of the Commissioner of Internal Revenue in assessing, on redetermination, a deficiency in income taxes against it in the sum of $1,786.49 for 1930, and $1,564.17 for 1931.

Since early in 1930, petitioner has been the owner of all the shares of a number of subsidiaries, including the Harding Publishing Company, Marion, Ohio. In each of the years involved the publishing company paid $13,299.96 to Abigail Harding Lewis and petitioner deducted these sums from the consolidated returns of the affiliated companies for both years. The payments were made to Mrs. Lewis, a sister of President Harding, under a power of attorney from a brother and two other sisters. The question is, whether these payments were deductible as ordinary and necessary expenses of the publishing company under section 23 of chapter 852, Revenue Act of 1928, 45 Stat. 791, 26 U. S.C.A. § 23 and note.

On June 18, 1923, President Harding owned 605 shares of the 800 shares of stock of the Marion Star. Shortly before that date Louis H. Brush and Roy D. Moore began negotiations with him for the purchase of his stock, offering him $500 per share. He advised that he was interested in protecting the minority stockholders, who were insisting upon $600 per share. These negotiations resulted in a contract executed on June 18, 1923, whereby Harding sold his shares to Brush and Moore "for the consideration and in accordance with and subject to the terms and conditions" of the agreement. The consideration included the payment of $5,000 in cash; $45,000 when the stock should be delivered; $113,000 and interest on or before December 18, 1923, and the delivery to Harding of 1,000 shares of the preferred stock of the reorganized The Harding Publishing Company. Assuming, with petitioner, that the preferred stock was valued at par, these figures aggregate $263,000, or a little more than $434 per share.

Shortly after June 18, 1923, Brush and Moore purchased the remaining 195 shares for $600 per share, or $117,000. If this showing reflects the actual fact, petitioners paid $380,000 for the entire stock of the paper and paid Harding about $165 per share less than the minority stockholders.

But the contract of June 18 with President Harding contained provisions other than those above indicated. The controversy here is over the fifth paragraph.[1] The employment contract therein contemplated was never executed because President Harding died on August 2d. Shortly thereafter a controversy arose over this fifth paragraph. Brush and Moore and the publishing company contended that this paragraph was a severable provision for the employment of President Harding as associate editor of the Star for ten years beginning September 1, 1923, upon a salary of $13,300 per annum, and that the contract being for personal services was discharged at his death. The executor of the Harding estate and Mrs. Harding insisted

---

[1] "Fifth—On or before September 1, 1923, said The Harding Publishing Company and said Vendor will enter into an agreement employing said Vendor as Associate Editor of The Marion Star for a term of Ten (10) years, beginning September 1, 1923, and ending August 31, 1933, at and for the salary consideration of Thirteen Thousand Three Hundred Dollars ($13,300.00) per annum payable monthly.

"(a) Said Purchasers promise and agree that the payment of said Vendor's salary as Associate Editor for the first five (5) years under said employment contract will be guaranteed by the American Surety Company of New York, or some other surety company of known financial responsibility.

"(b) Said employment contract will provide that at the expiration of said first five (5) years, said The Harding Publishing Company will then secure to said Vendor the payment of his salary as Associate Editor during the last five (5) years of the term of said contract, either by a suitable surety bond or collateral security of an amount and value to the satisfaction and approval of said Vendor."

"(c) Said employment contract will also provide that if said Vendor should die during the term of said ten (10) year contract, the then unpaid part of said salary shall be paid monthly to Mrs. Warren G. Harding, if she survives said Vendor, and if both Mr. and Mrs. Warren G. Harding should die during the term of said employment contract, then the unpaid part of said salary shall be paid monthly to the estate of Warren G. Harding."

that the $13,300 per annum for ten years was a part of the purchase price of the Harding stock, at $600 per share. Mr. Moore testified in substance that the consideration of $13,300 per annum was computed by counting the salary at $10,000 and the remainder for interest. If the annual payments of $13,300, less $3,300 for interest, represent installments upon the purchase price, then at the end of the ten-year period President Harding or his estate would have received exactly $600 per share, or an amount per share equal to that paid the minority stockholders. It is hardly conceivable that he would have taken less, although, according to the testimony of Moore, he was willing to have minority stockholders given preference in the matter of cash payment. Then, too, the obligations upon the purchasers in clauses (a) and (b) of the fifth paragraph to guarantee and secure the payment of the installments for ten years, and the further obligation in (c) that if Harding should die before the contract expired the unpaid part of the salary should be paid monthly to Mrs. Harding, if living, and if not, then to his estate, strongly militate against the proposition that paragraph 5 was simply an agreement for the employment and compensation of President Harding as associate editor.

However, on December 8, 1923, the parties made a settlement of their dispute by written agreement whereby the publishing company assumed all the obligations imposed upon Brush and Moore by the fifth paragraph of the agreement of June 18th, including the payment of $13,300 per annum for ten years beginning as of September 1, 1923, in accordance with the provisions of the article; the Harding interests waived their claim to security and accepted the personal guaranty of Brush and Moore, who in turn personally guaranteed the payments to the executor of the Harding estate and to Mrs. Harding. The closing part of this contract of December 8, 1923, contained this statement, "* * * the same being part of the original purchase price of the six hundred and five (605) shares of stock in The Harding Publishing Company purchased under said agreement."

■ The quoted phrase is an interpretation by the parties themselves as to what was intended by the fifth paragraph of the original agreement and the Board was justified in adopting it, under well-recognized rules of construction. Restatement of the Law of Contracts, § 235(e).

■■ The Board, upon the evidence, held that the payments to Mrs. Lewis were a part of the price of the Harding stock, or, in other words, were capital expenditures and not deductible, and we think its finding is amply supported. The burden was upon petitioner and it failed to show clearly and convincingly, or perhaps "indisputably," that the Board was wrong. Tracy v. Com'r., 6 Cir., 53 F.2d 575, 579; Atlas Plaster & Fuel Co. v. Com'r., 6 Cir., 55 F.2d 802; Marshall v. Com'r., 6 Cir., 57 F.2d 633; Guarantee Bond & Mortgage Co. v. Com'r., 6 Cir., 44 F.2d 297.

■ Petitioner contends that the settlement and payments were made because Mrs. Harding threatened suit to recover the installments due upon the salary of President Harding as associate editor; that her claim was of doubtful validity but because of the prestige of the late President such a suit would have injured the good will value of the Marion Star. Brush and Moore both testified in substance that the quoted statement from the contract of December 8, 1923, was untrue and was inserted through coercion of the attorneys for the Harding estate. We need not determine whether the Board would have been authorized to disregard this statement, upon collateral attack, because, as pointed out by the Board, no evidence of the character the law requires was offered to show that it resulted from fraud or coercion. Nor are we required to determine whether petitioner's evidence, if uncontradicted, would support its claim for deduction, as for "ordinary and necessary business expenses." The most that may be said is that in some respects it contradicts the findings of the Board, made upon substantial evidence. It does not refute or destroy them and we need go no further. We are not authorized to weigh the evidence or to determine the credibility of witnesses.

The decision of the Board of Tax Appeals is affirmed.