PINE STATE BY-PRODUCTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. YORK COUNTY RENDERING CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pine State By-Products, Inc. v. Commissioner
Docket Nos. 2276-71, 2277-71.
United States Tax Court
T.C. Memo 1973-139; 1973 Tax Ct. Memo LEXIS 147; 32 T.C.M. (CCH) 665; T.C.M. (RIA) 73139; June 26, 1973, Filed *147 Gerald Gillerman and Steven R. Kaye, for the petitioners. A. W. Dickinson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the income tax of petitioner Pine State By-Products, Inc., in the amount of $15,287.67 for the taxable year ended December 31, 1967, and *148 determined a deficiency in the amount of $3,940.74 in the income tax of petitioner York County Rendering Co. for its fiscal year ended January 31, 1968. 2 The issues for decision are (1) whether a $10,000 payment made by Pine State By-Products, Inc., to Roger Spada is deductible as amortization of a covenant not to compete under section 167, I.R.C. 1954, and (2) whether payments made by York County Rendering Co. to John P. Martin and Augustus Barber, pursuant to an agreement entitled a consulting and advisory contract, are deductible by that company as salaries under section 162(a) of the Code. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Pine State By-Products, Inc. (Pine State), a corporation organized in 1965 under the laws of the State of Maine, had its principal office at South Portland, Maine, at the time it filed its petition in this case. Pine State engaged in the rendering business.Pine State filed its Federal income tax return for the taxable year 1967 with the district director of internal revenue in Augusta, Maine. York Rendering Co. (York) which was also engaged in the rendering business, *149 was organized under the laws of the State of Maine. Its office was located in South Portland, Maine at the time it filed its petition in this case. York filed its Federal income tax return for its fiscal year ended January 31, 1968, with the district director of internal revenue in Augusta, Maine. Since its incorporation, Pine State has been engaged in the rendering of several types of byproducts. It converts fish byproducts, known as gurry or cuttings, which are left over after the fish are 3 filleted, into fish meal and fish oil. It converts fat, meat and bone byproducts which are picked up from wholesale butchers and from butcher stores into meat meal and tallow. It converts poultry byproducts, which are the poultry offal, or the innards of chickens, and chicken feathers, into feed products called poultry byproduct meal, poultry oil, and a feather meal. All these products are high protein supplements used by the animal feed industry. Upon its organization in 1965, Pine State was owned one-third by its then vice president and general manager, Abraham Levovitz; one-third by Maplewood Poultry Company, Belfast, Maine; and one-third by Hillcrest Poultry Company, Lewiston, *150 Maine. The two latter were in the business of processing chickens and purchased Pine State's products indirectly, through New England Feed Company, which they owned. York was organized in 1962 by Augustus Barker, President of Barber Beef and Poultry Company, and John P. Martin, president of Martin Foods, a grocery supermarket chain, both of Portland, Maine. In 1962, the owner of the rendering business to which Martin and Barber sold the byproducts from their respective businesses had died, and another company, Consolidated Rendering (Consolidated) took over the territory. Dissatisfied with Consolidated's prices, Martin and Barber decided to start a rendering company of their own. They each became 25 percent owners in the newly formed company, York. The remaining 50 percent of York's stock was acquired by Roger Spada, who was to operate the plant. Barber and Martin were officers of York and large suppliers of raw material to York. However, they generally spent only an hour or so once or twice a week at the York plant. 4 York purchased second-hand equipment for its plant. This equipment was for use in a batch type of rendering system rather than the modern continuous system. *151 When the batch system is used, the equipment is shut down after each 5,000 pounds is cooked and then that amount is pressed and this process repeated. By 1966, York and Pine State were competitors in the Portland, Maine area. Pine State had designed and purchased a new type of equipment which provided a continuous rendering system, enabling Pine State to use the same equipment to process fish byproducts, meat byproducts and poultry byproducts without shutting down the cooking operation. At that time, most companies processed each of these separately. The new equipment gave Pine State a capacity to handle much more raw material than it then had available. Levovitz decided to "go out and get" additional raw material. Pine State approached York's customers and offered to pay them more for raw material than York was paying them. York met any price offered by Pine State and lost none of its customers to Pine State. York was at this time handling about 5,000,000 pounds of material per year. In his program to outbid York for the material, Levovitz contemplated offering York's customers a penny a pound more. To meet this competition, it would have been necessary for York to expend *152 an additional $50,000 per year to keep obtaining 5,000,000 pounds of materials a year. William J. Mendelson, president of Hillcrest Poultry Company (a one-third owner of Pine State) learned of Levovitz's program to outbid York for the latter's customers. He held a meeting in December 1966 5 with Levovitz and Maxwell Wakely. Wakely, a C.P.A., was tax advisor and independent auditor for Pine State, Hillcrest, and Mendelson. Levovitz's program and its costliness were discussed. Wakely advised Mendelson that Levovitz's aggressive price campaign was the wrong approach and that the right approach to acquiring York's accounts would be to meet with Martin and Barber and negotiate with them. Mendelson agreed that Levovitz's program was not a prudent approach, mentioning that he, Mendelson, had close relationships with Martin and Barber. He suggested strongly that, rather than approach the situation as Levovitz had been doing, he and Levovitz should talk with Martin and Barber in an effort to work out an arrangement to acquire the raw material without destroying York. Levovitz agreed to this plan. Levovitz was of the opinion that Pine State could not make use of York's plant, *153 but that the people who knew York's customers might be of value to Pine State. It was Martin and Barber who had the contacts with York's suppliers. Levovitz discussed with Mendelson whether it would be possible to employ Martin and Barber as a means of keeping the York contacts. Arrangements were made for a meeting of representatives of Pine State with Martin and Barber. The meeting was held on Thursday, January 12, 1967, at Lewiston, Maine, the headquarters of Hillcrest Poultry Company with Levovitz, Wakely, and Mendelson present on behalf of Pine State. 6 Levovitz, at the outset, told Martin and Barber that he was not really interested in the purchase of York as a going business because the York plant was of no value to him. He stated that he was only interested in York's contacts and would agree to pay York for its business only the amount that Pine State could realize from disposition of York's physical assets including equipment, land, and building, since Pine State could not use York's assets. Levovitz made an offer of $30,000 for York's plant, including inventory and equipment. Barber's initial reaction was that the offer was very low. He regarded York as a successful *154 business and thought the price for York should be over $100,000. The meeting ended without agreement. At about this time, Barber after a study of York's figures, met with Spada, who had been working at York only Tuesday through Thursday of each week. He unsuccessfully tried to persuade Spada to stay a full week and to undertake a vigorous campaign to compete with Pine State. Martin and Barber than decided to look seriously into the possibility of merging with Pine State. Another meeting was held on Saturday, January 12, 1967, at Portland, Maine between Martin and Barber for York and Mendelson and Wakely for Pine State.Levovitz did not attend. Some progress was made toward an agreement for Pine State to purchase York's business assets. Upon request of Wakely, Levovitz looked over York's plant, equipment and inventory to determine what Pine State would offer for these assets. Levovitz studied York's balance sheets, especially the balance sheet of March 31, 1967, which showed the following assets and liabilities: 7 ASSETS Current assets:
Petty cash
$25.00
Cash in banks
17,158.93
Accounts receivable - Trade
30,436.53
Accounts receivable - Employee
134.00
Inventory - (at market)
18,943.68
Inventory - Supplies
893.94
Prepaid insurance
1,693.62
Prepaid auto and truck registrations
950.28
$70,235.98
Cash surrender value of life insurance
4,306.80
Fixed assets:
Land
1,895.74
Building
$48,495.50
Fixtures and equipment
113,481.82
Autos and trucks
41,896.07
203,873.39
Less - Reserves for Depreciation
94,296.94
109,576.45
111,472.19
Goodwill
2,190.58
188,205.55 LIABILITIES AND NET WORTH
Current liabilities:
Accounts payable - Trade
$11,048.09
Federal income tax payable - (Tax liability as of January 31, 1967 for year then ended)
5,142.62 Accrued and withheld payroll taxes
1,772.98
$17,963.69
Long-term obligations:
Note payable - Canal Bank (Secured)
72,966.57
Capital stock - Issued and outstanding:
Eighty (80) shares, Class A - Voting Common
8,000.00
Four hundred and twenty shares (420) Class B - non-voting common
42,000.00
50,000.00
Retained earnings
47,275.29
$188,205.55
*155 8 In determining his opinion of the value of York's assets to Pine State, Levovitz made the following adjustments to the assets shown on the March 31, 1967, balance sheet: (a) He deducted item 9, Cash surrender of life insurance, $4,307, since that item was not to be transferred. (b) He deducted $61,572 representing the difference between fixed assets of $111,472 shown on the balance sheet and his appraisal of liquidating value of those assets of $49,900. Levovitz determined a net worth of York based on these adjustments of $31,396. He concluded that $31,396 which he rounded off to $30,000 was the net asset value or liquidation value of York's assets. He did not determine a value for York as a going concern. He did not calculate separately the potential value of the list of York's customers or of York's goodwill. Levovitz and Wakely discussed what arrangement might be made to have Martin and Barber remain with the Pine State operation to assist with respect to the York accounts and whether Spada should participate in the operation of York. They concluded that Spada should not be asked to assist in the operation but that a covenant not to compete should be obtained *156 from him. The net income of York for each of its fiscal years ended January 31, 1962, through 1967, as shown in its U.S. corporation income tax returns was: 9 Fiscal year ended January 31
Net income
Net income after tax
1962
$15,196
-
1963
13,208
-
1964
1,933
-
1965
7,214
$7,214
1966
12,074
9,690
1967
23,472
18,329
In February 1967, after having made his study of York and having reached his conclusion that it had a liquidating value of $30,000, Levovitz met with Martin and Barber again. He explained to them that $30,000 was all Pine State would pay for York's assets. At that meeting Levovitz explained to Martin and Barber that Pine State was interested in the two of them assisting Pine State because of their good standing with the people in the trade from which Pine State would buy fat and bones. Levovitz was of the opinion that it would be to the advantage of Pine State to hire Martin and Barber so that Pine State would not have to compete for supply sources with York by offering more money to suppliers for the material as originally planned. There was discussion of payments to Martin and Barber of $7,500 each per year for a *157 period of 10 years for employment or consulting agreements, plus incentive payments to hold on to the York accounts for Pine State and a percentage of purchases for new accounts acquired by Martin and Barber. 10 Levovitz then negotiated with Spada. Spada originally took the position that his half interest in York was worth nearly $100,000. Nevertheless, when Levovitz offered him $30,000 for his York stock plus $40,000 for a covenant not to compete, he agreed to make the sale. He was influenced in this decision by his knowledge of the desire of Martin and Barber to sell York to Pine State and his view that because of this fact, he in reality had to sell his interest in York. Spada retained separate counsel, who entered into negotiations with the legal representatives of Pine State and with Martin and Barber. He agreed to report the amount received for his covenant not to compete as ordinary income. At the time the agreement was being drafted, the stockholders of York were as follows: Stockholders
No. of Class A shares
No. of Class B shares
Roger and Janet Spada, as joint tenants
40
210
John P. Martin
20
95
Augustus Barber
20
95
Carleton Tarpinian
20
*158 Class A stock was voting stock and Class B was nonvoting stock. On June 5, 1967, Martin, Barber, and Tarpinian contributed all of their York stock back to the corporation, leaving Spada as the sole stockholder. On June 5, 1967, Pine State acquired the entire issued and outstanding capital stock of York from Roger I. Spada, the sole stockholder, pursuant to a Purchase and Sale Agreement executed on that 11 day. Under the terms of the Agreement, Spada received $30,000 for the York stock and, in addition, agreed to a covenant not to compete with Pine State in the States of Maine, New Hampshire, and Massachusetts for a period of 5 years, for which he was to be paid a sum of $40,000 over 4 years. As part of the same transaction on June 5, 1967, Pine State entered into an employment agreement with identical terms, with John P. Martin and with Augustus Barber. Under the terms of these agreements Martin and Barber were employed for 10 years, for which each was to receive $7,500 annually, plus commissions on scrap purchased, and for new sources of supply. The agreements also contained 12-year covenants not to compete. Each agreement provided, in part, as follows: I. TERM *159 OF EMPLOYMENT The COMPANY hereby retains the EMPLOYEE as a consultant and the EMPLOYEE accepts such position with the COMPANY for a term of ten (10) years from the date hereof. II. DUTIES OF EMPLOYEE A. The EMPLOYEE will render advisory and consulting services during the term of his employment, and will give the COMPANY the benefit of his special knowledge, skill, contacts and business experience to the extent relevant to the rendering business and will keep reasonably informed as to the rendering operations of the COMPANY and those of its subsidiaries involved directly or indirectly in the rendering business and, as such advisor and consultant, promote their financial welfare. * * * IV. MINIMUM COMPENSATION The COMPANY agrees to pay the EMPLOYEE, and the EMPLOYEE agrees to accept as his minimum compensation for the services to be rendered by him hereunder, the sum of 12 Seventy Five Hundred Dollars ($7,500.00) annually, payable weekly. In the event the EMPLOYEE shall die before completing said ten years (10) of service hereunder, the COMPANY shall continue to make said weekly payments directly to the surviving widow of the EMPLOYEE until and for so long as the *160 total payments made to the EMPLOYEE during his lifetime and to his said widow equal the amount that would have been paid to the EMPLOYEE if he had survived and lived for the full term of employment contemplated hereunder. In the event that the EMPLOYEE's wife shall not survive him, or shall die before receiving the total of the compensation to be paid hereunder, then the balance of the same shall be payable in the manner aforesaid to the then living children of the EMPLOYEE, share and share alike. V. COVENANT NOT TO COMPETE A. Provided that the COMPANY is not in default hereof, the EMPLOYEE covenants and agrees that he will not during the term during which he is entitled to receive any minimum or additional compensation hereunder, and for a period of two years (2) thereafter, engage directly or indirectly in any business (other than that of the COMPANY) which is competitive with that business in which the COMPANY is now engaged. * * * * * * VI. ADDITIONAL COMPENSATION In addition to the minimum compensation provided for hereunder, and as additional compensation for the services to be rendered by the EMPLOYEE, the COMPANY agrees to pay the EMPLOYEE additional compensation *161 during each year of the term hereof for a period of ten (10) years from the date hereof, an amount equal to the sum of the following: A. Two and one-half cents (2 1/2") per hundredweight of raw product (meaning, but not by way of limitation, bones, fat, non-petroleum greases, skins, and hides; and particularly those products acquired and/or purchased in rendering company operations, all of which are hereinafter referred to as "raw product") purchased or obtained by the COMPANY from one or more of those customers of York County Rendering Co. listed on Schedule A hereof, the EMPLOYEE having represented that said list to his best knowledge and belief comprises all of the old customers of York County Rendering Co. as of June 5, 1967; and 13 B. Plus five cents (5'4A") per hundredweight of said "raw product" purchased or obtained by the COMPANY from any new customer, if and only if the EMPLOYEE and/or Augustus Barber [John P. Martin] is the direct and effective cause of securing such new customer for the COMPANY.In no event shall the EMPLOYEE be paid said amount per hundredweight for raw product purchased from present customers of the COMPANY or new future customers of the COMPANY *162 who become future customers of the COMPANY through no effort or solicitation by the EMPLOYEE. * * * The customer list referred to in paragraph VI. A. was attached to the agreement. Also attached to each employment agreement was a letter executed by Mendelson on behalf of Pine State, which read: This letter is collateral to and given in consideration of your execution of the Employment Agreement above captioned. It is distinctly understood and agreed by both Pine State By-Products, Inc. and its directors and stockholders that: 1. Notwithstanding the provisions of the Employment Agreement, the amount of time which you shall devote to your duties shall be at your sole discretion. 2. Regardless of duration, you shall have the right to take leaves of absence, etc. under ARTICLE III of the Agreement for as long a period of time as you in your discretion shall elect or desire, and further, shall not be in violation of the Agreement if you shall be unavailable for extended periods of time or if you shall move your place of residence permanently from the State of Maine to any other place; except that should you move your place of resident from the State of Maine during the *163 term of the Agreement you hereby agree that you shall be available at reasonable times for telephone communications with Pine State By-Products, Inc. relative to the consulting and advisory duties and services to be provided by you. 14 The employment contracts were subsequently assigned by Pine State to its newly acquired wholly-owned subsidiary York. As part of the same transaction on June 5, 1967, Pine State and William J. Mendelson, owner of a one-third equity interest in Pine State, entered into a Consent and Hold Harmless Agreement with Martin, Barber and Spada and each of their wives. Under the terms of the agreement, Pine State and Mendelson agreed to relieve Martin, Barber and Spada and their wives of personal liability on a $100,000 promissory note dated October 13, 1964, given by York to Canal National Bank of Portland, Maine, which had a then outstanding balance of $73,000. Additionally, Martin and Barber entered into a Guarantee Agreement with Pine State under the terms of which they guaranteed Spada's performance of his obligations under the purchase and sale agreement. After acquiring York, Pine State operated it as a purchaser of materials which were *164 resold to Pine State at a fixed mark-up. The trucks used to pick up materials from suppliers to York continued to be marked with the name of York. The services rendered by Barber to York after the sale consisted primarily in 1967 of calling on most of the suppliers to York, telling them that Pine State was now the owner of York, that Pine State would give them the same service York had given them and if any problem arose to call him or John Martin. 15 In 1967, Barber went to the Pine State plant a few times and took a few telephone calls from persons who were dissatisfied with the material pick-up service and passed the information on to officers of Pine State. In each of the years following 1967, Barber's services to York consisted of receiving about a dozen telephone calls from persons dissatisfied with some aspect of the material purchases or collections by York and passing the information on to officers of Pine State. The only service rendered by Martin to York or Pine State was an unsuccessful effort to obtain another grocery chain similar to the one he operated as a supplier to Pine State. Martin's business remained as a supplier to York and thus to Pine State and *165 the general knowledge of Martin's association with York and Pine State has been of benefit in retaining former York suppliers. A payment of $10,000 was made by Pine State to Spada for the calendar year 1967 on his covenant not to compete in accordance with the terms of the purchase and sale agreement. Pine State deducted the payment as depreciation under section 167(a). Respondent in his notice of deficiency to Pine State disallowed the claimed deduction with the explanation that the payment of $10,000 was in substance part of the purchase price of Spada's stock. Payments of $5,100 each to Martin and Barber were made by York for its fiscal year ended January 31, 1968, under the terms of their employment agreements. York deducted these amounts on its income tax return for its fiscal year 1968 as compensation to employees deductible under section 162(a). Respondent in his 16 notice of deficiency to York disallowed the claimed deductions with the explanation that these sums were not ordinary and necessary business expenses but were in substance amounts paid to Martin and Barber to acquire their respective shares of stock in York and therefore capital expenditures. OPINION
*166 The issues for decision are whether payments made by York, a wholly-owned subsidiary of Pine State, to Martin and Barber are deductible as ordinary and necessary business expenses under section 162(a), I.R.C. 1954, [1] and whether payments made by Pine State to Spada are deductible as amortization of the cost of a covenant not to compete under section 167. [2]
*167 17 Respondent contends that all the amounts paid to Martin and Barber under their employment contracts with York, and all or a substantial portion of the amount paid to Spada under a covenant not to compete are in substance amounts paid for their stock in York and therefore constitute capital expenditures under section 263. [3]
Petitioners and respondent recognize that the substance of the transaction and not merely its form controls the treatment of the payments for Federal income tax purposes. Where the Commissioner attacks the form of an agreement selected by buyer and seller, as here, the court will examine the substance of the transaction so that the operation of the tax laws will not be frustrated by the mere form in which the transaction is drawn. *168 Gregory v. Helvering, 293 U.S. 465 (1935), and Commissioner v. Court Holding Co., 324 U.S. 331 (1945). Having considered the substance of the transactions here involved in the light of all the evidence of record, we conclude that the covenant not to compete and employment agreements in question were not total shams in that there is substance to some payment for these purposes although not in the amounts set forth as allocable to such payments in the agreements. However, in our view there is no substantive basis for an amount as little as $30,000 being designated as the purchase price of Spada's stock in York and there being in form no 18 payment made to either Martin or Barber for his York stock. In our view the York stock had a value well in excess of $30,000 and part of the payments for Spada's covenant not to compete and part of the payments to Martin and Barber under their employment agreements were in fact and substance payments for the stock of York. First, in considering the validity of the covenant, we have, on the basis of the record before us, concluded that Spada's covenant not to compete was not entirely without substance. In fact *169 it was an important aspect of the transaction. It was separately bargained for by Pine State, and had independent significance in the negotiations which led to the agreements whereby Pine State acquired York. We have determined that this covenant was "important, meaningful, and valuable" to Pine State, even though as hereinafter pointed out, of less value than the value assigned to it in the agreement. Ray H. Schultz, 34 T.C. 235 (1960), affirmed 294 F. 2d 52 (C.A. 9, 1961); Frances Silberman, 22 T.C. 1240 (1954). Cf. Gazette Telegraph Co., 19 T.C. 692, affirmed 209 F. 2d 926 (C.A. 10, 1954). In the Schultz case, as here, respondent was attacking a transaction in the form which both seller and buyer found acceptable. We held that amounts allocated to a covenant not to compete were in reality the price paid for the goodwill of the seller's business. The Ninth Circuit, in affirming our decision, enumerated certain factors which indicated a sale of goodwill rather than consideration for a covenant not to compete. Among *170 these were the lack of desire of the seller to compete, the 19 inability of the seller to compete, the shortness of the duration of the covenant, and the minimal restriction of the covanant as to area. These factors are not present in the instant case to an appreciable extent. The covenantor, Spada, was very experienced in the rendering business, and was responsible for the entire management and operation of York's plant. He was capable of competing in the New England area, and in view of his reluctance to sell his interest in York, was probably not adverse to the possibility of competing with Pine State. In fact, he eventually did reenter the rendering business in New York State. Therefore, we find that Spada's promise not to compete for 4 years in Maine, Massachusetts, and New Hampshire bestowed a valuable benefit upon Pine State, and was necessary to eliminate a competitive threat to Pine State for a substantial period of time in those areas in which it carried on its rendering business. Respondent contends that the payments to Martin and Barber which are labeled compensation are, in substance, payments for their stock. Respondent points out that the employment agreements *171 do not require Martin and Barber to perform any specific services. Respondent emphasizes the contents of a confidential letter attached to each agreement, which permits Martin and Barber to take unlimited leaves of absence from York and to devote so much time to York as they see fit. Finally, respondent notes that upon the death of either Martin or Barber, Pine State was obligated to continue to make compensation payments to the widow or estate of the deceased employee and therefore the employment 20 agreements deviate from the normal employment contract. See Brush-Moore Newspapers v. Commissioner, 95 F. 2d 900 (C.A. 6, 1938), affirming 33 B.T.A. 362 (1935), certiorari denied 305 U.S. 615 (1938). Petitioner, on the other hand, asserts that the agreements were for consulting and advisory services, not full-time employment, and that Martin and Barber were required to stand ready to serve if called upon. In Henry P. Wager, 52 T.C. 416 (1969), the taxpayer-seller contended that amounts received under an advisory and consulting contract were capital in nature, as part of the purchase price of his patent. In upholding the *172 contract as a bona fide employment agreement, the proceeds of which were ordinary income to the taxpayer (Wager), this Court stated the following at 419: * * * The fact that petitioner was not called upon to provide any services in the year in question and that he served only a few days in other years does not undercut a finding of economic reality in this phase of the agreement. United bargained for and received petitioner's agreement to be available for services, rather than his services for which a separate consideration of $200 per day was provided. There is no indication on this record that United did not intend to utilize petitioner's services or that petitioner believed he would not be called upon to render services. Faced with a payment-after-death provision similar to the one here, the Court stated (at 419): Finally, we note that the fact that the agreement called for a continued reduced level of payment in the event of petitioner's death, illness, or incapacity is immaterial in the context of the apparent arm's-length bargaining and attendant economic reality involved herein. Benjamin Levinson, 45 T.C. at 391; Eitingon-Schild Co. and Subsidiaries, 21 B.T.A. 1163, 1182 (1931). *173 21 Although the services that Martin and Barber performed for York after the sale were minimal, they were similar in nature to their duties prior to the sale of York. The record shows that Pine State was most interested in utilizing the personal contacts of those two men by continuing their nominal association with York. While the evidence is sufficient to show that the employment agreements were not total shams, the record is equally clear that the purported salary did not in its entirety represent payment to Barber and Martin for their nominal service to York. Here, unlike the Wager case, the record shows that the $30,000 stated by Pine State to constitute the entire payment for all of the York stock was unduly low, while the amounts designated compensation to Martin and Barber are unduly high in light of the services performed. Moreover, respondent asserts, and we agree, that Martin and Barber would not have divested themselves of their stock in York without receiving something in return. Since we agree with respondent that part of the payments made to Barber and Martin under their contracts with Pine State was for their stock and that more than $30,000 of the payment *174 to Spada was for his stock interest, it is necessary for us to examine the entire transaction to determine what portion of the payments to Spada, Martin, and Barber represented consideration for the sale of York's stock. In making this determination, we do not consider the liquidating value of York's assets, even if that value had been established by the evidence, which it was not to our satisfaction, as controlling. 22 Pine State introduced certain opinion testimony to the effect that the purchase price of $30,000 reflects the true value of York's stock. Petitioner's estimate, based on liquidation value of York's fixed assets, totally fails to account for the goodwill, customer lists, and market position of York, the valuable intangibles of a going enterprise. Also in our view the value of the physical assets are excessively discounted. Had a buyer been sought to purchase the assets to continue the York operation, there is no evidence to show that the value of the assets would not have been close to the book value shown on the March 31, 1967, balance sheet. The evidence shows that in 1967 most rendering plants operated with equipment of the general type used by York and not *175 with the more modern equipment used by Pine State. Obviously, Pine State did not intend to offer the York assets for sale to an operator who would operate a rendering plant on the York property as a going concern, thereby creating a new competitor for Pine State. However, the liquidating value of the York assets sold piecemeal to persons who would remove them from the York plant and the sale of the real property for a use which York had not made of it is not a proper criterion for valuing the York assets to determine the fair market value of the York stock. Even though Pine State argues that it used liquidation value because it intended to dissolve York's rendering operations and sell off the tangible assets, it is apparent that Pine State did not simply acquire York to discontinue its going business. Rather, Pine State 23 continued to use York's trade name, assigned the employment contracts with Martin and Barber to York, and utilized that company's customer lists in order to exploit York's contacts with suppliers of raw material. These circumstances indicate that the $30,000 purchase price is unreasonably low, and does not reflect the true value of York's stock. *176 In valuing the stock of a closely held corporation such as York, no particular method of valuation is controlling. The fair market value may be determined by considering among other factors both the value of the assets and the capitalization of earnings depending on the facts and circumstances in each case. Portland Manufacturing Co., 56 T.C. 58, 80 (1971). Respondent in his brief has suggested that we capitalize York's earnings at a ratio of 10 times earnings and thereby arrive at a value of $117,440. Considering the short earnings records of York and the competitive forces in the industry, as well as the value of York's assets as carried on its balance sheet ($97,275), we find respondent's valuation slightly optimistic. In our view, upon consideration of all the evidence, the amount of $100,000 is the value of the York stock. In arriving at this value we have considered the net worth of York's tangible and intangible assets and York's earnings potential, as well as the testimony of Barber that he considered the York stock to be worth over $100,000, perhaps as much as $120,000. 24 Since in our view the fair *177 market value of the York stock in June 1967 was $100,000, we conclude that Spada received $50,000 for his one-half interest in York, plus $20,000 for a covenant not to compete. Pine State is therefore entitled to amortize the latter amount over the 4-year life of the covenant. We further find that Martin and Barber were to receive $25,000 each for his respective 25 percent interest in York. The remaining $50,000 payable to each man over the 10-year period is compensation. Thus, one-third of the $5,100 payment to each Martin and Barber in 1967 should be treated as capital in nature and the remaining amount as a deductible expense by York. Decisions will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩
2. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
3. SEC. 263. CAPITAL EXPENDITURES. (a) General Rule. - No deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. ↩