TURKEY CREEK, INC., and TURKEY CREEK, INC., AS SUCCESSOR BY MERGER TO N.W., INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turkey Creek, Inc. v. Commissioner
Docket Nos. 4217-86; 4218-86.[1]
United States Tax Court
T.C. Memo 1987-429; 1987 Tax Ct. Memo LEXIS 426; 54 T.C.M. (CCH) 326; T.C.M. (RIA) 87429; August 26, 1987. Walter M. Tovkach and Thomas G. Christmann, for the petitioners. Jane T. Dickinson, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket
Year Ended
Petitioner
Number
June 30
Deficiency
Turkey Creek, Inc.
4217-86
1980
$ 46,879
Turkey Creek, Inc. as
4218-86
1978
$ 86,220
Successor by Merger to
1980
$    285
N.W., INC.
*427 The issues for decision in docket No. 4217-86 are (1) whether the issuance of promissory notes by Turkey Creek Inc., to a shareholder-employee was for services rendered in previous years, and if so, whether the promissory notes constitute "payment" for purposes of section 404; [2] and (2) whether Turkey Creek had unreported income in the amount of $ 23,852 as determined by respondent. The issue in docket No. 4218-86 is whether the issuance of a promissory note by N.W., Inc., to an employee for services rendered in previous years is fully deductible in the year of issuance. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and associated exhibits are incorporated herein by reference. Petitioner in docket No. 4217-86 is TurkeyCreek, Inc. ("Turkey Creek"). Petitioner in docket No. 4218-86 is Turkey Creek as successor by merger to N.W., Inc. ("N.W."). At the time the petitions were filed *428 herein, Turkey Creek had its principal place of business in Alachua, Florida. Both Turkey Creek and N.W. were Florida corporations and accrual basis taxpayers at all relevant times. Turkey Creek, a real estate construction and development company, was organized in 1974. Ralph W. Cellon, Jr. ("Cellon") was one of its original stockholders. Norwood W. Hope ("Hope"), while not an original stockholder, has been its president since incorporation. As of 1977 the outstanding stock in Turkey Creek was owned 50 percent by Cellon and his wife and 50 percent by Hope and members of his family. The Cellons and the Hope family also owned the stock of and had both debtor and creditor relationships with several other corporations which over the years had been operated in close conjunction with Turkey Creek. Cellon was employed by Turkey Creek in a management capacity from 1974 to 1980. His primary duties during such period involved public relations and attempting to obtain appropriate zoning for Turkey Creek's real estate projects. He did not receive a regular salary for such duties. By January 1980, Turkey Creek was in poor financial condition. Its financial statements reflected a negative *429 net worth and it was in arrears on about $ 4,500,000 in loans. In spite of its conditions, Cellon could not or would not contribute additional capital to Turkey Creek or incur any additional personal indebtedness to keep it in operation. On the other hand, Hope and his family wanted to continue with Turkey Creek but were unwilling to make any further investment without a similar commitment by Cellon. To overcome the resulting stalemate, and at Hope's suggestion, it was agreed that the Cellons would transfer their interest in Turkey Creek to the Hopes. However, the contemplated transfer was complicated by the stock and debts outstanding between the parties and their other related corporations. In an attempt to resolve all of these problems the Cellons and the Hopes together with Turkey Creek and five other corporations entered into an agreement which contained the following pertinent preambles and other provisions: WHEREAS, the Cellons enumerated above and the Hops enumerated above have combined in various business ventures and have done business with one another and together for a number of years, and WHEREAS, as a result of these ventures several corporations are owned by *430 both the Cellons and the Hopes, and WHEREAS, it is the desire of the Cellons and the Hopes that these jointly-owned corporations be wholly owned by the Hopes and that the Cellons are compensated for their interests therein, and WHEREAS, it is also the desire of the Cellons and the Hopes that each continue other business relationships with the other in a manner most beneficial to each, and WHEREAS, as a result of past dealings, the Cellons now owe one of the Hopes' companies, N.W., Inc., $ 147,815.42 as of January 31, 1980, and WHEREAS, this agreement will completely satisfy this indebtedness and future dealings between the parties subsequent to January 31, 1980, will be dealt with separately on a normal account basis, and WHEREAS, a corporation now jointly-owned by the Cellons and the Hopes, TURKEY CREEK, INC., now owes the Cellons $ 180,433.29 as of the date of this agreement, and WHEREAS, this agreement will completely satisfy this indebtedness, and future dealings between these parties subsequent to this agreement will be dealt with separately on a normal account basis, and * * * WHEREAS, N.W., INC., presently possesses a security interest in a portion of the Cellons' *431 stock in TURKEY CREEK, INC., for the purpose of protecting the Hopes or their corporations for property they put up as collateral in the event of a default by the Cellons or their corporations on that certain $ 100,000.00 note from the Cellons to University City Bank (now Great American Bank) under date of November 15, 1978, and WHEREAS, this agreement will completely satisfy that security interest, and WHEREAS, in exchange for this satisfaction of this security interest, the Cellons will herein agree to personally indemnify the Hopes and any of their corporations for any injury as a result of the Cellons' actions or inactions with regard to the aforesaid note, and WHEREAS, N.W., Inc., under mortgage dated January 25, 1980, has secured a $ 45,000.00 note of Ralph W. Cellons, Jr. with C & L Bank of Bristol, Florida and N.W., INC., TURKEY CREEK, Inc., Norwood W. Hope, N. Forest Hope and A. Bice Hope were required by said bank to endorse said note, and WHEREAS, this agreement will not satisfy the aforesaid note, but will make provisions for the Cellons' indemnity to said corporations and individuals for any injury as a result of Cellons' actions or inactions with regard to the *432 aforesaid note and will further provide for N.W., Inc. or the Hopes' ability to redeem this mortgage and offset any costs of redemption against payments due the Cellons under other provisions of this agreement, and WHEREAS, the Cellons have personally endorsed as guarantors certain obligations of TURKEY CREEK, INC., and WHEREAS, since this agreement cannot satisfy or change the obligations of the Cellons to third parties, the Hopes will herein agree to personally indemnify the Cellons and any of their corporations with regard to any of the TURKEY CREEK, INC. notes which the Cellons have endorsed, and WHEREAS, TURKEY CREEK, INC. currently owes Ralph W. Cellon, Sr. the sum of $ 30,000.00, which is a portion of a past due payment plus accrued interest since January 4, 1980, and WHEREAS, TURKEY CREEK, INC., will pay this amount (plus any additional accrued interest) to Ralph W. Cellon, Sr., on or before April 30, 1980. NOW, THEREFORE, the parties hereto and each of them and their heirs, assigns, designees and successors hereby agree and covenant one to the other that the following will occur simultaneously with the execution of this agreement. A. TURKEYCREEK, INC. will give *433 Ralph W. Cellon, Jr. a draft in the amount of $ 1,250.00, and Ralph W. Cellon, Jr. will endorse his 1000 shares of TURKEY CREEK, INC., stock over to TURKEY CREEK, INC. Ralph W. Cellon, Jr. hereby warrants and guarantees that there are no liens or other claims on said stock excepting that lien to be extinguished as provided in paragraph K. below. * * * D. TURKEYCREEK, INC. will give Ralph W. Cellon, Jr., a draft in the amount of $ 147,815.42, and Ralph W. Cellon, Jr. will give a draft in the amount of $ 147,815.42 to N.W., Inc. E. TURKEYCREEK, INC. will give Ralph W. Cellon, Jr. a noninterest bearing promissory note in the principal amount of $ 32,617.87 which is due and payable on or before February 28, 1986. * * * G. TURKEYCREEK, INC. will give Ralph W. Cellon, Jr. a promissory note in the principal amount of $ 200,000.00 for a term of five years and to accrue interest at 12% per annum beginning March 27, 1980. Equal principal and interest payments under such note shall be made monthly beginning on April 27, 1980. Norwood W. Hope, Jayne F. Hope, N. Forest Hope, Patricia W. Hope, A. Bice Hope and Donna P. Hope will endorse and personally guarantee said note. H. *434 TURKEYCREEK, INC. will give Ralph W. Cellon, Jr. a promissory note in the principal amount of $ 100,000.00 for a term of five years to accrue interest at 12% per annum beginning on April 27, 1985. Equal principal and interest payments under such note shall be made monthly beginning on May 27, 1985. I. Ralph W. Cellon, Jr. will execute a satisfaction on his original note receivable from TURKEY CREEK, INC. in the amount of $ 100,000.00. J. N.W., INC. will execute a satisfaction of its original note receivable from Ralph W. Cellon, Jr. in the sum of $ 136,000.00. * * * P. By the execution hereof, Norwood W. Hope and Jayne F. Hope hereby agree to personally indemnify any injury or harm Ralph W. Cellon, Jr. or Jean M. Cellon may suffer as a result of any default on any TURKEYCREEK, INC. notes which Ralph W. Cellon, Jr. has endorsed. * * * R. The terms and provisions of this agreement are binding on the heirs, successors, assigns, devisees and legatees of the parties hereto. S. This agreement constitutes the entire agreement between all parties hereto, and said parties are not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, *435 representations, or information not specifically set forth herein. The agreement was duly executed on February 21, 1980 by all parties including the related corporations and Hope's son A. Bice Hope, who not only executed it personally but, as general counsel, reviewed and approved it for Turkey Creek. On the same date the $ 200,000 note and the $ 100,000 note referred to in paragraphs G and H of the agreement were executed by Turkey Creek and delivered to Cellon. Each note was payable in sixty equal monthly installments together with interest at the rate of 12 percent per annum on the unpaid balance. On March 17, 1980, a special meeting of the new Board of Directors of Turkey Creek was held. The Board consisted of Hope and his two sons, A. Bice Hope and N. Forest Hope, all of whom were recorded as present. The minutes of the meeting state the following: During the work session a discussion was held relative to the corporation's former stockholder, Ralph W. Cellon, Jr. Each of the Directors expressed a desire to continue a working relationship with Mr. Cellon and to that end instructed the Chairman to request Mr. Cellon's help in corporate matters at a weekly salary beginning *436 at $ 150.000. The Directors discussed that the $ 300,000.00 in long term notes which were given to Mr. Cellon were for past management and consulting services rendered and that the new weekly salary would compensate him for his future efforts. It was agreed among those present that Mr. Cellon's continuing association with the corporation at this compensation level would be beneficial to all concerned. [Emphasis supplied.] In an attempt to bolster Turkey Creek's financial position, the Hopes thereafter decided to merge Turkey Creek with N.W., another family owned and operated construction company. However, prior to merging they also decided to redeem all of N.W.'s outstanding stock which was owned by nonfamily members. One of these individuals was Wilbur M. Harling, Jr. ("Harling"), who owned 2.6 percent of N.W.'s stock. Harling had been employed in full-time managerial positions by the Hope family since early 1940. He had always received a salary, as well as, annual bonuses in insubstantial amounts. The Hope family felt that Harling should be retired prior to the proposed merger because he was 65 years old and in bad health. Accordingly, on June 2, 1980, two agreements *437 were entered into between Harling and N.W. The first was entitled "STOCK SALE AGREEMENT" and provided for the cash purchase by N.W. of Harling's stock in N.W. for $ 6,000. The second agreement was entitled "COMPENSATION AGREEMENT" and in pertinent part it reads as follows: WHEREAS, WILBUR M. HARLING, JR. has been part of the management of Jim Hope Electrical for many, many years, and WHEREAS, WILBUR M. HARLING, JR.'s contributions to the Welfare of Jim Hope Electrical and its associated employees have been many, and WHEREAS, WILBUR M. HARLING, JR. has not always been compensated for amounts he was entitled for his past services as a result of cash flow problems from time to time in the company, and WHEREAS, WILBUR M. HARLING, JR. is about to partially retire from Jim Hope Electrical, and WHEREAS, N.W., INC., the corporate entity which owns Jim Hope Electrical, now desires to give WILBUR M. HARLING, JR. sufficient compensation to make up for the lack of same in previous years for his past efforts. NOW THEREFORE, for and in consideration of the mutual covenants herein contained, the receipt of which is acknowledged, the parties hereto agree for themselves and their assigns, *438 successors and heirs forever as follows: 1. N.W., INC. does hereby agree to pay WILBUR M. HARLING, JR. the total sum of Three Hundred Thousand Dollars ($ 300,000.00) as compensation for past services rendered. This indebtedness shall be represented by a Note from N.W., INC. to WILBUR M. HARLING, JR. in the total sum of Three Hundred Thousand Dollars ($ 300,000.00) payable monthly over a ten year period with no interest. This Note shall not be negotiable, but in the event WILBUR M. HARLING, JR. dies prior to the expiration of ten years from the date of the Note, the payments due thereunder shall be paid unto WILBUR M. HARLING, JR.'s estate.
The $ 300,000 promissory described in the compensation agreement was given to Harling on the same date by N.W. N.W. was merged into Turkey Creek on June 30, 1980, but despite the merger, Turkey Creek was forced to file a petition under of Chapter 11 of the Bankruptcy Act in September 1982. Turkey Creek, with the approval of the Bankruptcy Court, continued to make the payments on the notes payable to Cellon, and in 1985, Turkey Creek obtained the approval of the Bankruptcy Court to sell certain land to Harling upon such terms that the monthly *439 payments due by Harling to Turkey Creek were exactly equal to the monthly payments due by Turkey Creek to Harling. Thereafter, to the date of trial no money had passed between Harling and Turkey and Creek. On its corporate income tax return for the fiscal year ended on June 30, 1980, Turkey Creek claimed a deduction for management fees in the amount of the $ 300,000 in promissory notes given to Cellon. On its corporate return for the taxable year ending on the same date, N.W. claimed a deduction for $ 300,000 represented by the note given to Harling. With its deduction N.W. claimed an operating loss carryback of $ 276,585 from the taxable year ending on June 30, 1980 to the taxable year ending on June 30, 1978. In his statutory notices, respondent disallowed both deductions in fiscal 1980 as well as N.W.'s operating loss carryback to fiscal 1978. On its return for the fiscal year ending June 30, 1980, Turkey Creek also reported its unappropriated retained earning account as follows: Balance at beginning of year
($ 438,569)
Net income per books
196,426 Merged N.W., Inc. on 6/30/80
264,489 Federal Income Tax Refund N.W., Inc.
112,000 Federal Income Tax
Refund Turkey Creek, Inc.
61,708 Prior Period Adjustment
85,509 Balance at end of year
281,563 *440 During audit neither respondent nor Turkey Creek could account for $ 23,852 of the amount included in the "Prior Period Adjustment" to the retained earnings account. Therefore, in his statutory notice respondent determined that the $ 23,852 adjustment represented unreported taxable income. OPINION
Cellon's Notes
Petitioner Turkey Creek contends that the promissory notes issued to Cellon constitute payment for past management services and as such as fully deductible in the taxable year ending June 30, 1980. To the contrary, respondent contends that the notes were issued in payment for the purchase of capital assets, and, therefore, cannot be considered as compensation for services rendered by Cellon. In support of his position respondent cites Brush-Moore Newspapers, Inc. v. Commissioner,95 F.2d 900 (6th Cir. 1938), cert denied 305 U.S. 615 (1938); and Nicholas Co. v. Commissioner,38 T.C. 348 (1962). For the reasons set out below we agree with respondent. First, Turkey Creek would have us disregard the entire written agreement of February 21, 1980, which as a whole tends to indicate it was intended by the parties *441 to bring the jointly owned corporations within the sole ownership of the Hope family. For instance, it specifically states that it was "the desire of the Cellons and the Hopes that these jointly-owned corporations be wholly owned by the Hopes and that the Cellons [be] compensated for their interests therein . . ." The agreement further provides that it "constitutes the entire agreement between all parties hereto, and said parties are not liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations, or information note specifically set forth herein." Furthermore no mention is made in the agreement of any compensation being due to Cellon for past services rendered to Turkey Creek or that the notes were being issued in payment for such services. Second, the only evidence offered in support of petitioner's contention, and to refute the statements made in the agreement is the testimony of Norwood W. Hope and A. Bice Hope who, at trial stated in general terms that the notes were issued in payment for Cellon's past services. Their self-serving and obviously biased testimony is unpersuasive, however, because it is not corroborated *442 by any evidence in the record with the possible exception of the minutes of the special meeting of Turkey Creek's board of directors. Here again, no weight can be attributed to the minutes because the meeting occurred over a month after the agreement was executed, the board consisted of three Hopes, and the minutes are clearly a belated attempt by them to avoid the tax consequences of their agreement. Finally, petitioner offered no explanation for failing to call Cellon as a witness even though admitting knowledge as to his whereabouts. The unexplained failure to produce such a knowledgeable witness within their power is sufficient basis for an inference that if produced his testimony would have been unfavorable to petitioner. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), aff'd. 162 F.2d 513 (10th Cir. 1947). In view of the foregoing, it is concluded that the promissory notes were issued to Cellon in payment for his interests in Turkey Creek and the related corporations and not as compensation for past services. Respondent's determination *443 on this issue is sustained.
Harling's Note
Petitioner Turkey Creek as successor to N.W. contends that the $ 300,000 represented by the note payable to Harling is deductible by N.W. in 1980, the year the note was issued, as compensation for personal services actually rendered by Harling to N.W. in previous years. Respondent does not dispute petitioner's claim that the note was issued for past services rendered by Harling but contends that the note constitutes a form of deferred compensation which does not qualify for deduction under section 404. Under either view of the transaction, to be deductible the amount represented by the note must constitute reasonable compensation for the services rendered. Under petitioner's view such a finding is required by section 162(a). [3] Under respondent's view a similar finding is required by section 404(a) and (b). [4]
*444 Therefore, even if we assume that the issuance of the note by N.W. in 1980 qualifies in all other respects for deduction in that year, we still have to determine under either view of the transaction, whether the amount involved is reasonable. Where as here a deduction is claimed in a current year for a payment purportedly made for services rendered in previous years, the reasonableness of the payment in the current year is determined by reference to the difference between the value of the past services and the amounts, in any, previously paid for such services. The value of the past services is determined by reference to their nature, amount, and quality. See Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930); R. J. Nicoll Co. v. Commissioner,59 T.C. 37 (1972). The burden of proof with respect to the various elements to be considered in determining the reasonableness of a deduction claimed for a current payment for past services is upon the claimant of such deduction. American Foundry v. Commissioner,59 T.C. 231, 239 (1972), affd. *445 on this issue 536 F.2d 289 (9th Cir. 1976); Perlmutter v. Commissioner,373 F.2d 45, 48 (10th Cir. 1967). In the case before us petitioner has produced no evidence as to Harling's salary in past years or of the extent, nature, quality, or value of his services except some vague references to the fact that he had been a devoted employee of the Hope family and of Jim Hope Electrical for many years. The exact nature and duration of the relationship between N.W. and Jim Hope Electrical does not appear from the record. However, the compensation agreement of June 2, 1980 recites that as of that date N.W. owned Jim Hope Electrical. In view of the condition of the record, it is apparent that Turkey Creek as successor to N.W. has failed to establish that the amount of the note issued to Harling in 1980 represents the reasonable value of uncompensated services rendered by Harling to N.W. in prior years. As a result the deduction claimed by N.W. on its return for the year ended June 30, 1980 with respect to such note or the uncompensated services it allegedly represented is not allowable and N.W.'s operating loss for such year and its operating loss carryback *446 to 1978 is reduced accordingly.
Turkey Creek's Unreported Income
As set out in our findings respondent determined that the adjustment of $ 85,509 made by Turkey Creek at the end of its 1980 fiscal year to its retained earnings account included unreported taxable income to the extent of $ 23,852. Turkey Creek admits that the adjustment was made, that it is unable to account for the adjustment, and that the inability is due to Turkey Creek's failure to correctly identify and report all items of taxable income. At trial petitioner was able to either an income tax refund or some adjustment related to the N.W. merger. Turkey Creek, however, also admits that sums were allocated to each of these items on its allocations should be adjusted. Therefore, under these unusual circumstances petitioner has failed to overcome the presumption that respondent's determination is correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. These cases have been consolidated for purposes of trial, briefing and opinion. ↩
2. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
3. The pertinent part of section 162(a) reads as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * * ↩
4. The pertinent parts of section 404 as in effect in 1980 are as follows: SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule. -- If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but if they satisfy the conditions of either of such sections, they shall be deductible under this section * * * * * * (b) Method of Contribution, Etc., Having the Effect of a Plan. -- If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or other plan deferring the receipt of compensation, subsection (a) shall apply as if they were such a plan. ↩